**[Cite as *State v. Wright*, 2023-Ohio-2895.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2022-CA-27 |
| | : | |
| v. | : | Trial Court Case No. 20 CR 87 |
| | : | |
| KEVIN C. WRIGHT | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on August 18, 2023

. . . . . . . . . . .

ANTHONY E. KENDELL, Attorney for Appellee

STEPHEN E. PALMER, Attorney for Appellant

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Defendant-Appellant, Kevin C. Wright, appeals from a judgment denying his petition for post-conviction relief without holding a hearing. According to Wright, the trial court abused its discretion, applied incorrect legal standards, and erroneously denied his petition without conducting a hearing. Alternatively, Wright argues that the court erred

in denying his petition on the merits.

{¶ 2} After considering the entire record and the evidence attached to the petition, we conclude that the trial court erred in part in denying a hearing on the petition. The court erred in failing to distinguish between standards that apply to ineffective assistance claims on direct appeal and what is required for simply obtaining a hearing on a petition for post-conviction relief. A post-conviction petition does not have to definitively establish counsel's deficiency or that the defendant was prejudiced by the deficiency. Instead, a petition must be sufficient on its face to raise issues about whether the defendant was deprived of effective assistance of counsel, and the claim must depend on factual allegations that cannot be decided by examining the record from the defendant's trial.

{¶ 3} The trial court also erred in rejecting various claims because the same issues had been raised on direct appeal. Where matters outside the record are presented, the fact that an issue had been raised on direct appeal is not an appropriate basis for rejecting a post-conviction petition. In addition, the court erred in categorically stating that failure to call an expert and reliance instead on cross-examination did not constitute ineffective assistance of counsel. This is true in direct appeals, where courts are often forced to speculate, as this alone cannot overcome the strong presumption that trial counsel rendered reasonable assistance. However, it does not apply in post-conviction situations, where courts are able to consider matters outside the record and are, therefore, not confined to speculation.

{¶ 4} On the other hand, the trial court correctly rejected one expert's affidavit, which did not concern matters outside the record. The court also correctly rejected a claim based on trial counsel's failure to file a motion to suppress. While the suppression

claim involved matters outside the record, the petition was insufficient on its face as there was no possible basis for suppression. Accordingly, the judgment will be affirmed in part and reversed in part, and the matter will be remanded for a hearing on some issues raised in the petition for post-conviction relief, as set forth in this opinion.

## I. Facts and Course of Proceedings

{¶ 5} As noted in our prior opinion, "Wright was indicted on February 7, 2020, on three counts of rape involving the same victim, K.W., who is a relative of Wright. Each count was alleged to have occurred during a separate period of time or on a specified date: the first count alleged that Wright engaged in sexual conduct with K.W. between August 1, 2017, and June 1, 2018; the second count alleged sexual conduct between August 1, 2018, and June 1, 2019; and the third count alleged sexual conduct on December 8, 2019." *State v. Wright*, 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, ¶ 2. At the time of trial in April 2021, K.W. was 13 years old and was in the eighth grade. She testified that the sexual abuse had begun in fifth grade and had continued until December 2019, when she was in seventh grade. *Id.* at ¶ 6-10 and 13-19.

{¶ 6} On Monday, December 9, 2019, K.W. asked a school friend (Mercedes) " 'what is it called if someone's dad is doing stuff to them that she doesn't want them to do.' " *Id.* at ¶ 21. When Mercedes responded that " 'it was called "rape or something like that" and inquired why K.W. was asking,' " "K.W. claimed she was 'asking for a friend.' " *Id.* After Mercedes told K.W. not to lie to her, K.W. said that Wright " 'was doing things to her.' " *Id.* The next day (December 10, 2019), Mercedes told school

authorities about the conversation, and an investigation ensued. *Id.* Wright's home was searched that evening and several items were collected, including K.W.'s bedding and clothing belonging to K.W. and Wright. The police sent the items to be tested, and no semen was found on any items. The lab did find "touch DNA" on the waistband of a pair of K.W.'s underwear, which was part of a mixed profile from which K.W. and Wright could not be excluded. *Id.* at ¶ 26-29, 32-33 and 35-36. Wright was subsequently charged on three counts of rape and pled not guilty. *Id.* at ¶ 2.

{¶ 7} At trial, the State presented testimony from the following individuals: Sergeant Cline of the Covington Police Department, the School Resource Officer for K.W.'s school; K.W.; Mercedes; Kayla M., a teacher who participated in the December 10, 2019 discussion with K.W. that led to a police report; G.B., K.W.'s maternal grandfather; Lieutenant Moore of the Miami County Sheriff's Office, who participated in the search of Wright's home and conducted a follow-up interview with K.W.; Mary Barger, a forensic scientist in the serology and DNA section of the Miami Valley Regional Crime Laboratory ("MVRCL"), who testified about DNA findings; Dr. Miceli, a pediatric psychologist at Dayton Children's Hospital, who had not examined K.W. but discussed sexual abuse, the typical disclosure process for sexually abused children, and behavioral characteristics of abused children; Detective Sergeant Cooper of the Miami County Sheriff's Office, the lead investigator for the case; and Dr. Kelly Liker, the Chief of the Division of Child Advocacy and a child abuse pediatrician at Dayton Children's Hospital. Dr. Liker had not met K.W. but testified about K.W.'s medical exam on December 10, 2019, which was normal, and about the physical structure of the hymen. *Id.* at ¶ 3-5, 6-20, 21-22, 23-24, 25, 26-31, 32-39; 40-46, 47-52, and 53-54. *See also* Transcript of Jury

Trial Held on April 26-30, 2021 ("Tr."), 45-59, 59-146, 147-156, 156-160, 171-177, 177-199, 203-230, 230-242, 243-286, and 287-306.

{¶ 8} The defense then presented testimony from the following individuals: Mother (K.W.'s mother and Wright's wife); Wright's stepfather; H.S., a friend of the Wright family; Dr. Holland, a board-certified obstetrician and gynecologist who had not examined or treated K.W. but testified about the structure of the hymen and the effect of estrogenization and non-estrogenization on the hymen and injury to that area; and Wright, who testified on his own behalf. *Wright* at ¶ 56-67, 68, 69, 70-75, and 76-86. *See also* Tr. at 307-342, 343-346, 347-351, 352-373, and 373-404.

{¶ 9} After hearing the testimony, the jury found Wright guilty on all charges, and the court sentenced him to a mandatory prison term of ten years to life on each count, with the sentences to run consecutively for a total of 30 years to life in prison. *Wright* at ¶ 1.

{¶ 10} On direct appeal, Wright raised ten assignments of error. These included: (1) error in admitting hearsay testimony from Officer Cline, Mercedes, Det. Cooper, and Lt. Moore and in allowing multiple witnesses to repeat K.W.'s statements to establish her consistency; (2) admitting testimony from Cooper and Moore that "vouched" for K.W.'s credibility; (3) plain error in allowing Dr. Liker to testify about the hymen's "elasticity," which exceeded the scope of her report; (4) plain error of prosecutorial misconduct during closing argument by: (a) misrepresenting evidence as to the touch DNA on K.W.'s underwear; (b) "speculating that, because Wright was a police officer, he had 'some unique ability to conceal his misdeeds' "; (c) urging sympathy for K.W.; (d) offering the

prosecutor's own opinion on K.W.'s credibility; (e) impassioned speech culminating in referring to Wright as a "monster"; and (f) improperly attempting to play on the jury's emotions by indicating that "defense counsel 'had embarrassed and belittled the alleged victim' during cross-examination"; (5) error in refusing to let Dr. Holland provide " 'key context to his conclusions' "; (6) plain error in adding language to the jury instructions that created an overbroad definition of penetration; (7) ineffective assistance of trial counsel in "failing to consult with and call expert witnesses, failing to object to inadmissible testimony and argument, and employing deficient trial strategy"; (8) the State's failure to provide sufficient evidence of the elements of the offenses; (9) the convictions were against the weight of the evidence; and (10) cumulative error, *Wright*, 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, ¶ 89-93, 117-118, 125, 132, 137, 139, 141, 143, 146, 152 160, 165, and 198. After considering the alleged errors, we found no merit in the first nine assignments of error, rejected cumulative error, and affirmed the judgment. *Id.* at ¶ 212-213.

{¶ 11} Our opinion was issued on May 27, 2022. On July 20, 2022, Wright filed a petition for post-conviction relief in the trial court. The petition included the following items: (1) Kevin Wright's affidavit; (2) Mother's affidavit; (3) affidavit of P.W. (Wright's mother); (4) affidavit of A.W. (Wright's stepfather); (5) affidavit of Dr. David Thompson, a clinical child psychologist board-certified in forensic psychology; (6) affidavit of James Swauger, an expert in digital forensics analytics of electronic cell phone and computer data; (7) affidavit of Dr. Robert Levine, a board-certified family physician with experience in providing care to sexual assault victims and conducting sexual assault examinations; (8) affidavit of Mark Satawa, a criminal defense attorney with experience defending

against allegations of sexual assault and abuse involving children; (9) affidavit of Dr. Theodore Kessis, an expert in the use and application of DNA typing; and (10) an Appendix submitted under seal ("App.").

{¶ 12} The appendix included: (1) expert reports from Dr. Thompson, Swauger, Satawa, and Dr. Kessis; (2) pretrial emails between Wright and his trial attorney and post-trial emails between Wright's current counsel and the trial attorney; (3) Wright's polygraph results; (4) trial discovery materials, including content relating to two search warrant affidavits and the inventory from each search, MVRCL DNA Reports and underlying laboratory data, transcripts of police interviews with K.W., Mother, and J.B. (the maternal grandmother), and videos of K.W.'s interviews.

{¶ 13} On August 26, 2022, the State filed a memorandum opposing Wright's post-conviction petition. The State included affidavits from its trial experts (Barger, Dr. Liker, and Dr. Miceli), who responded to points made by the experts who supported Wright's petition. In addition, the State included an affidavit from Det. Cooper, who responded to Swauger's report and to Dr. Thompson's discussion of Cooper's interviewing techniques. Finally, the State submitted a number of unauthenticated documents relating to the training of Det. Cooper and Lt. Moore. *See* Exs. 4 and 5 attached to State's Memorandum Contra Petition for Post-Conviction Relief ("State Response").

{¶ 14} On September 26, 2022, Wright submitted a reply memorandum and supplemental affidavits from Dr. Levine, Dr. Kessis, and James Swauger, all of which addressed the statements made in the expert affidavits attached to the State Response. The trial court then filed a decision and entry overruling the petition without a hearing.

*See* Decision and Entry Denying Defendant's Petition for Post-Conviction Relief (Oct. 11, 2022) ("Decision").   This timely appeal followed.

## II.   Failure to Conduct a Hearing

{¶ 15} Wright's first assignment of error states that:

The Trial Court Abused Its Discretion, Applied Incorrect Legal Standards, and Erroneously Denied Wright's Petition for Post-Conviction Relief Without Conducting a Hearing in Violation of R.C. 2953.21(D) and Due Process of Law as Guaranteed by the Fifth, Sixth, and Fourteenth Amendments in the United States Constitution and Comparable Provisions of the Ohio Constitution.

{¶ 16} Wright's first claim under this assignment of error is that the trial court applied incorrect standards for post-conviction petitions.   Before addressing that point, we will outline the appropriate standards in these cases.

{¶ 17} "Ohio law permits a person convicted of a crime to petition the trial court for an order setting aside his conviction on the basis that 'there was such a denial or infringement of the person's rights as to render the judgment void or voidable under the Ohio Constitution or the Constitution of the United States.' "   *State v. Blanton*, Ohio Slip Opinion No. 2022-Ohio-3985, __ N.E.3d __, ¶ 24, quoting R.C. 2953.21(A)(1)(a)(i).

{¶ 18} The constitutional right involved here is based on the Sixth Amendment of the United States Constitution, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to * * * have the Assistance of Counsel for his defence." This includes "the right to effective counsel – which imposes a baseline requirement of

competence on whatever lawyer is chosen or appointed." *United States v. Gonzalez-Lopez,* 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). Ohio's constitution grants a corresponding right, and Ohio evaluates ineffective assistance claims under the same standards that federal courts use. *E.g., State v. Worley*, 164 Ohio St.3d 589, 2021-Ohio-2207, 174 N.E.3d 754, ¶ 95; *State v. Bell*, 176 Ohio App.3d 378, 2008-Ohio-2578, 891 N.E.2d 1280, ¶ 132 (2d Dist.).

**{¶ 19}** "To establish that trial counsel was ineffective, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *State v. Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, ¶ 26, citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "Regarding the prejudice prong, the defendant must prove that there is a 'reasonable probability' that counsel's deficiency affected the outcome of the defendant's proceedings." *Id.*, quoting *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* " 'When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.' " *Id.*, quoting *Strickland* at 695.

**{¶ 20}** "In order to grant a hearing on a timely postconviction petition, the trial court must 'determine whether there are substantive grounds for relief.' " *Id.* at ¶ 23, quoting R.C. 2953.21(D). "If the petition 'is sufficient on its face to raise an issue that the petitioner's conviction is void or voidable on constitutional grounds, and the claim is one which depends upon factual allegations that cannot be determined by examination of the

files and records of the case, the petition states a substantive ground for relief.' " *Id.*, quoting *State v. Milanovich*, 42 Ohio St.2d 46, 325 N.E.2d 540 (1975), paragraph one of the syllabus. The Supreme Court of Ohio has also said that "[a] petition presents substantive grounds for relief when it contains allegations that are sufficient to state a constitutional claim and the files and records of the case do not affirmatively disprove the claim." *Blanton*, Ohio Slip Opinion No. 2022-Ohio-3985, __ N.E.3d __, at ¶ 24, citing *Milanovich* at 50, and R.C. 2953.21(F).

{¶ 21} "In determining whether the petition states a substantive ground for relief, the trial court must consider the entirety of the record from the trial proceedings as well as any evidence filed by the parties in postconviction proceedings." *Bunch* at ¶ 24, citing R.C. 2953.21(D). "If the record on its face demonstrates that the petitioner is not entitled to relief, then the trial court must dismiss the petition. *Id.*, citing R.C. 2953.21(D) and (E). "If the record does not on its face disprove the petitioner's claim, then the court is required to 'proceed to a prompt hearing on the issues.' " *Id.*, quoting R.C. 2953.21(F).

{¶ 22} An abuse of discretion standard applies to decisions granting or denying post-conviction relief, "including the decision whether to afford the petitioner a hearing." *State v. Hatton*, 169 Ohio St.3d 446, 2022-Ohio-3991, 205 N.E.3d 513, ¶ 38, citing *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 51-52 and 58. An abuse of discretion " 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.' " (Citations omitted.) *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). However, "most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*,

50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Decisions are unreasonable if they are not supported by a sound reasoning process. *Id.*

{¶ 23} The Supreme Court of Ohio has held it "axiomatic" that " '[n]o court – not a trial court, not an appellate court, nor even a supreme court – has the authority, within its discretion, to commit an error of law.' " *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 38, quoting *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 26 (2d Dist.). *Accord State v. Kocevar*, 2d Dist. Montgomery No. 29483, 2023-Ohio-1513, ¶ 24. "Applying the wrong legal standard in a postconviction proceeding is also reversible error under an abuse-of-discretion standard." *Bunch* at ¶ 25. *See also In re L.R.M.,* 2015-Ohio-4445, 42 N.E.3d 799, ¶ 16 (12th Dist.) (noting abuse of discretion may be found when the trial court " ' "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact" ' ").

{¶ 24} Another consideration in these cases is that "res judicata does not bar a postconviction ineffective-assistance-of-counsel claim when either (1) the petitioner had the same attorney at trial and on appeal or (2) he must rely on evidence outside the trial record to establish his claim for relief. * * * The converse is that when the petitioner had a new attorney on appeal and the claim could have been litigated based on the trial record, res judicata applies and the postconviction claim is barred." *Blanton*, Ohio Slip Opinion No. 2022-Ohio-3985, __ N.E.3d __, at ¶ 2, citing *State v. Cole*, 2 Ohio St.3d 112, 113-114, 443 N.E.2d 169 (1982).

{¶ 25} The *Cole* rule (which *Blanton* described as "seminal") "protects the rights of

petitioners by allowing postconviction review of ineffective-assistance claims that truly depend on evidence outside the trial record (for example, a claim regarding counsel's failure to present evidence). Indeed, under the current rule, claims that rely on evidence outside the record may be heard on postconviction review even if similar claims have been previously raised and adjudicated against the petitioner in his direct appeal." *Id.* at ¶ 30 and 41, citing *State v. Smith*, 17 Ohio St.3d 98, 101, 477 N.E.2d 1128, fn.1 (1985).

{¶ 26} With these standards in mind, we will consider Wright's arguments.

## A. Application of Incorrect Standards

{¶ 27} Wright's brief has challenged the trial court's application of legal standards in a number of instances. His initial point is that the trial court imposed an erroneously high standard for assessing ineffective assistance of counsel. Appellant's Brief, p. 9. In its decision, the trial court stated, concerning the prejudice prong of ineffective assistance of counsel, that the defendant "must demonstrate * * * that the errors were serious enough to create *a reasonable probability that but for the errors, the outcome of the case would have been different.*' " (Emphasis sic.) Decision, p. 4, quoting *State v. Deaton*, 2d Dist. Montgomery No. 28375, 2020-Ohio-6955, ¶ 20, citing *Strickland*, 466 U.S. 668, 104 S.Ct. 2052, and *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989). According to Wright, "the correct *Strickland* standard is not that high, but requires only a 'reasonable probability sufficient to undermine the outcome.' " Appellant's Brief at p. 9, citing *Strickland* at 694 and *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 37.

{¶ 28} We note that *Strickland* made both of the above statements. *See*

*Strickland* at 694 (stating that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome."). Thus, the trial court did not err in this respect, as it specifically quoted *Strickland*; the court simply omitted the second part of *Strickland's* statement.

{¶ 29} Later in its decision, the trial court also said that "a constitutional violation does not occur unless the defendant was prejudiced, i.e., the result of the trial's outcome would have been different." Decision at p. 5. This statement does not account for the "reasonable probability" qualification. However, the United States Supreme Court has said that "an occasional shorthand reference" to the *Strickland* standard is not a repudiation of the standard. *Woodford v. Visciotti*, 537 U.S. 19, 23-24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002). In that case, the California Supreme Court had used the term " 'probable' without the modifier 'reasonably' " on several occasions in the course of denying a defendant's state court habeas (post-conviction) petition. *Id*. at 23, quoting *Visciotti v. Woodford*, 288 F.3d 1097, 1108-1109 and fn.11 (9th Cir.2002).

{¶ 30} The United States Supreme Court noted that the state court had "painstakingly" described the *Strickland* standard elsewhere in its opinion. *Id*. As a result, the state court did not apply a standard of proof higher than what *Strickland* required. *Id*. Consistent with *Visciotti*, the trial court in the case before us did not err by omitting the term "reasonable probability" on one occasion or in omitting the second part of the standard.

{¶ 31} However, that is not the issue here. Unlike the current case, *Visciotti* did not address the standards for deciding if a defendant was entitled to a hearing on a post-conviction petition. Instead, *Visciotti* involved an appeal of a federal circuit court of appeals' decision in a habeas case. The circuit court had found that the California Supreme Court's decision denying the defendant's habeas petition " 'ran afoul of both the 'contrary to' and the 'unreasonable application' conditions of" 28 U.S.C. 2254(d)(1). *Visciotti*, 437 U.S. at 21-22, quoting *Visciotti*, 288 F.3d at 1118-1119. These are necessary requirements for granting a federal habeas petition. *Id.* at 21.

{¶ 32} Both the federal district court and the circuit court found that counsel's deficient performance had prejudiced bthe defendant during the death penalty phase of his trial. *Id.* The United States Supreme Court disagreed and reversed. *Id.* at 27. During its discussion, the court made the above remarks about the state court's occasional shorthand reference to the *Strickland* standard.

{¶ 33} Notably, the defendant in *Visciotti* received an evidentiary hearing on his petitions in both the California Supreme Court and in the federal district court. *Id.* at 21, citing *In re Visciotti,* 14 Cal.4th 325, 926 P.2d 987, 58 Cal.Rptr.2d 801 (1996). *See also Visciotti,* 288 F.3d at 1104. Therefore, no issue about the right to an evidentiary hearing was involved.

{¶ 34} In light of the preceding discussion, any error here was not one of improper citation of a standard, but in applying it to this particular situation. Specifically, in *Bunch*, the Supreme Court of Ohio focused on an "ineffective-assistance claim as it relates to a decision whether to grant a hearing on a postconviction petition rather than as it affects a decision on the merits of an appeal or on the merits of the postconviction petition."

*Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 27. In this regard, the court stressed that a defendant's "postconviction petition *need not definitively establish counsel's deficiency or whether [the defendant] was prejudiced by it*. Instead, *the petition must be sufficient on its face* to raise an issue whether [the defendant] was deprived of the effective assistance of counsel, and [the defendant's] claim depends on factual allegations that cannot be determined by examining the record from his trial." (Emphasis added.) *Id.*, citing *Milanovich*, 42 Ohio St.2d 46, 325 N.E.2d 540, at paragraph one of the syllabus. (Other citation omitted.)

{¶ 35} *Bunch* faulted both the trial and appellate courts because they "failed to apply the proper standard for reviewing whether a hearing was required on [the defendant's] post-conviction ineffective assistance claim and instead treated [the claim] as one on the merits in a direct appeal." *Bunch* at ¶ 29. The incorrect treatment in question was holding the defendant to "the standard of *proving* that 'the outcome of the proceedings would have been different but for counsel's deficient performance.' " (Emphasis added.) *Id.* at ¶ 28, quoting *State v. Bunch*, 7th Dist. Mahoning No. 18 MA 0022, 2021-Ohio-1244, ¶ 23.

{¶ 36} In the case before us, the trial court discounted most of the allegations in Wright's petition on the following grounds: (1) the claim was one that "Defendant could have raised on appeal"; (2) "Defendant does not contend the trial outcome would have been different" and "defendant must show that [counsel's error's] actually had an adverse effect on the defense"; (3) the court's opinion about what Wright, as a police officer, would have known about forensic data analysis, child psychology; and medical analysis; (4) the

claim relied on hearsay; (5) the claim was "cumulative" to matters raised on appeal; (6) the claim implicated "nothing new" and was "cumulative to Petitioner's arguments on direct appeal"; (7) the claim "leans on trial strategy"; (8) trial counsel consulted with a similar expert prior to trial but elected not to use the expert; (9) additional information about physiology and strategy was an effort to use "hindsight"; (9) the argument raised in the petition was the "same" as what Wright raised on appeal; (10) failure to call an expert and to rely instead on cross-examination "is not ineffective assistance"; and (11) "debatable trial strategy decision cannot constitute ineffective assistance of counsel." Decision at p. 10, 11, 14, 15, 16, 18, 19, 20, 22, and 23.

{¶ 37} As an initial point, rejecting claims because they are the same as those raised on direct appeal violates the established principle that "claims that rely on evidence outside the record may be heard on postconviction review even if similar claims have been previously raised and adjudicated against the petitioner in his direct appeal." *Blanton*, Ohio Slip Opinion No. 2022-Ohio-3985, __ N.E.3d __, at ¶ 41, citing *Smith*, 17 Ohio St.3d at 101, 477 N.E.2d 1128, fn. 1, and *Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169.

{¶ 38} Furthermore, *Bunch* faulted both lower courts' reliance on the standard articulated in *State v. Nicholas*, 66 Ohio St.3d 431, 613 N.E.2d 225 (1993), which was that " 'the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.' " *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 36, quoting *Nicholas* at 436. This is the standard the trial court quoted and applied here. *See* Decision at p. 22 (finding that failure to call an expert DNA witness did not constitute ineffective assistance of counsel).

{¶ 39} In *Bunch*, the court explained why this statement in *Nicholas* was initially

adopted and why it does not apply to post-conviction petitions like the one before us. Specifically, *Nicholas* involved a direct appeal, which the court had "repeatedly held" is "not the appropriate place to consider allegations of ineffective assistance of trial counsel that turn on information that is outside the record." (Citations omitted.) *Id.* at ¶ 35. The court stressed that "[b]ecause we cannot consider information outside the record in a direct appeal, we must often conclude that a defendant's claims are speculative. * * * And speculation alone cannot overcome 'the "strong presumption" that counsel's performance constituted reasonable assistance.' " *Id.*, quoting *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836, ¶ 89. (Other citation omitted.)

**{¶ 40}** After quoting *Nicholas's* statement that failing to call an expert and instead relying on cross-examination is not ineffective assistance, *Bunch* further explained the difference between direct appeals and post-conviction cases, stating that:

Our holding in *Nicholas* and its ilk, though broadly worded, *is not applicable to postconviction claims of ineffective assistance of counsel, where courts have the ability to consider evidence outside the record and are not limited to mere speculation.* In the present context of postconviction litigation, it is possible and appropriate to question whether a trial counsel's decisions were in fact deliberate and strategic and whether strategic decisions were reasonable ones. Trial strategy is usually within the "wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674, but *strategy is not synonymous with reasonableness*.

(Emphasis added.) *Bunch* at ¶ 36.

{¶ 41} Therefore, the trial court incorrectly failed to distinguish between standards that are appropriate in direct appeals and those that are not appropriate where evidence outside the record is submitted that could not have been considered on direct appeal.[1]

{¶ 42} Turning now to the content in Wright's brief, we note that his argument is separated into several sections, beginning with trial counsel's inadequate investigation and trial preparation. We will use the same format.

### B. Inadequate Investigation and Trial Preparation

{¶ 43} Under this section, Wright argues that trial counsel falsely told him that he did not need to be concerned about the case and that the State had no evidence and would either not indict or dismiss the case. Wright contends that, consistent with this lax attitude, counsel failed to adequately prepare Wright or Mother for testimony and to prepare for trial. Appellant's Brief at p. 12-13. These claims were based on affidavits of Wright, Mother, Wright's stepfather, P.W., and Wright's own mother, A.W.

{¶ 44} The trial court discounted all these affidavits, finding them "self-serving"; based on hearsay because they quoted statements made by defense counsel and defense counsel did not had participated in the petition; were speculative; and were basically of no effect because trial counsel's ineffective assistance in being unprepared for trial had previously been raised on direct appeal. Decision at p. 12-16

---

[1] We note that our most recent citation of the *Nicholas* standard in a post-conviction case occurred before *Bunch* was issued in December 2022. *See Deaton*, 2d Dist. Montgomery No. 28735, 2020-Ohio-6955, ¶ 27. Because the Supreme Court of Ohio has disapproved this standard for post-conviction cases, we will no longer cite *Nicholas* in such cases for the proposition that "failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel."

**{¶ 45}** As noted, the trial court incorrectly relied throughout its decision on the fact the matters being asserted had previously been raised on direct appeal. After reading the trial court record, including the trial transcript, we find that the matters these affidavits alleged were outside the record and could not have been addressed during the direct appeal. The trial court therefore erred in rejecting the affidavits for that reason. However, that does not mean the trial court erred in its remaining analysis.

**{¶ 46}** "[I]n reviewing a petition for postconviction relief filed pursuant to R.C. 2953.21, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact." *State v. Calhoun*, 86 Ohio St.3d 279, 284, 714 N.E.2d 905 (1999). Review of this issue would be based on abuse of discretion, which, as noted above, refers in most cases to whether a court's decision is unsupported by sound reasoning. *AAAA Ents.*, 50 Ohio St.3d at 161, 553 N.E.2d 597. The Supreme Court of Ohio has also said that "appellate courts may not decide the credibility of an affidavit supporting a postconviction petition in the first instance." *Blanton*, Ohio Slip Opinion No. 2022-Ohio-3985, ___ N.E.3d ___, at ¶ 98.

**{¶ 47}** In *Calhoun,* the court remarked that "[a]n affidavit, being by definition a statement that the affiant has sworn to be truthful, and made under penalty of perjury, should not lightly be deemed false." *Calhoun* at 284. The court outlined several factors to aid in deciding credibility, including: "(1) whether the judge reviewing the postconviction relief petition also presided at the trial, (2) whether multiple affidavits contain nearly

identical language, or otherwise appear to have been drafted by the same person, (3) whether the affidavits contain or rely on hearsay, (4) whether the affiants are relatives of the petitioner, or otherwise interested in the success of the petitioner's efforts, and (5) whether the affidavits contradict evidence proffered by the defense at trial." *Id.* at 285, citing *State v. Moore,* 99 Ohio App.3d 748, 754-756, 651 N.E.2d 1319 (1st Dist.1994). Additionally, "a trial court may find sworn testimony in an affidavit to be contradicted by evidence in the record by the same witness, or to be internally inconsistent, thereby weakening the credibility of that testimony." *Id.*

{¶ 48} *Calhoun* involved a post-conviction claim that the defendant did not "knowingly, intelligently, and voluntarily waive his constitutional rights," and the petition was supported by the affidavits of the defendant and his mother, who outlined statements the defense attorney made to them before and after the plea. *Id.* at 283 and 285-286. On review, the Supreme Court of Ohio found no abuse of discretion in the trial court's weighing of credibility, noting the affidavits were self-serving and relied on hearsay and the "affiants were relatives of the petitioner or otherwise interested in the success of petitioner's efforts." *Id.* at 287.

{¶ 49} Since the issue involved a plea rather than a trial, the court also reviewed the Crim.R. 11(C) colloquy, which indicated complete compliance with the rule's requirements. *Calhoun* at 287. In this regard, the court stated that "Defendant's supporting affidavits clearly have the effect of recanting prior statements defendant made on the record, both orally and in writing in his signed plea agreement, at the time he entered his plea in open court. There is nothing in the record to corroborate defendant's claims. This court has held that a record reflecting compliance with Crim.R. 11 has

greater probative value than contradictory affidavits." *Id.* at 288-289, citing *State v. Kapper*, 5 Ohio St.3d 36, 38, 448 N.E.2d 823 (1983).

{¶ 50} Where trials occur, the same observations might not apply, since defendants have a constitutional right under the Fifth Amendment to not testify, and they most often elect not to do so. *E.g., Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316, 38 L.Ed.2d 274 (1973). In other words, in the normal jury trial situation, a trial court will have few, if any, statements of record to compare.

{¶ 51} We have interpreted the decision in *Kapper* "to stand for the proposition that where the affidavit of a petitioner for post-conviction relief is belied by the record, the petitioner's own, self-serving affidavit is not sufficient to require the trial court to hold an evidentiary hearing." *State v. Buhrman*, 2d Dist. Greene No. 2003-CA-55, 2004-Ohio-1016, ¶ 28. Here, while Wright did testify, most of his affidavit concerned his attorney's lack of preparation and statements that Wright's attorney allegedly made to him off the record concerning the attorney's confidence that the State had no proof and would dismiss the case, if not before trial, then during trial. Thus, while Wright's testimony of record was available to compare, most of it did not relate to the matters outlined in his affidavit.

{¶ 52} In any event, the trial court did apply the *Calhoun* factors. *See* Decision at p. 13-15. Again, we do not decide credibility in the first instance. Nonetheless, the Supreme Court of Ohio has stressed that "although an appellate court must not reweigh the witness testimony when reviewing a trial court's credibility determination, that does not mean it may skip reviewing a court's credibility determination of a witness in the name

of deference."  *State v. Weaver*, Ohio Slip Opinion No. 2022-Ohio-4371, __ N.E.3d __, ¶ 35.

{¶ 53} In this context, we note that some emails between Wright and his attorney supported Wright's affidavit.   For example, Wright's attorney stated at the beginning of the case that the prosecutor "is going to present his case to the Grand Jury in a manner that will not result in an indictment and he can report to the victim witness agency that the charges were presented.   In sum, you want it presented and no charges resulting so you have confirmation that the investigation is over."   App., A-84.   *Compare* Wright Affidavit attached to Petition for Post-Conviction Relief ("Petition"), ¶ 4-5.

{¶ 54} Wright's affidavit further stated that he asked his attorney about experts, including a DNA expert.   Wright said he wanted to retain experts, but his attorney assured him they were not needed.   *Id.* at ¶ 22, 24, 25, 28, 29, 36, and 41.   Two emails were submitted that show that Wright inquired about experts prior to trial.   In an August 2020 email, Wright contacted his attorney because he believed a deadline to disclose experts was approaching.   Wright asked if experts could be disclosed after the deadline, but he received no answer.   *Id.* at ¶ 30, and App. at A-86 and A-88.   There was nothing in the record to rebut this.

{¶ 55} Furthermore, the trial court's insertion of its own observations and conjecture was erroneous.   For example, Wright's affidavit described his attorney's conduct when Wright was convicted as looking "straight ahead, sweating profusely," and not looking at or talking with Wright.   Wright Aff. at ¶ 18.   In its decision, the court stated that it "did not observe any unusual behavior of counsel" and noted that counsel had responded to the court's inquiry as to whether he wanted the jury polled and had also

asked that the bond be continued until sentencing.   Decision at p. 13, citing Tr. at 442.

{¶ 56} In a post-conviction case, the court of appeals held that "[u]nless a judge's observations are either stated upon the record or verified by the record, a party simply has no means of challenging the veracity of those observations.   Therefore, as to facts which are not of record, the better procedure may have been to have held a hearing to allow appellant to object to any such 'off record' judicial notice.   In the absence of such a hearing, it can be argued that a party may be denied due process unless he is allowed to question the judge as to the accuracy of the observations."   *State v. Jackson*, 11th Dist. Trumbull No. 2004-T-0089, 2006-Ohio-2651, ¶ 38.

{¶ 57} As applied here, the trial court did cite to the record.   However, whether counsel responded to the matters the court mentioned was irrelevant, since Wright's statements were based on his own interaction with his attorney, not on his counsel's brief interaction with the court.

{¶ 58} The trial court also discounted Wright's statement that "he was unaware, until after he was convicted, 'that experts in the area of DNA, child psychology, forensic data analysis, and medical evidence would have assisted in the defense and provided helpful testimony at trial.' "   Decision at p. 14, quoting Wright Aff. at ¶ 37.   The court's reason for discounting this was that Wright, as a police officer at two small police departments, had worked his own cases.   *Id.*   From this, the court concluded, "It is difficult to believe that Defendant had no awareness that experts in the foregoing areas might have assisted his defense.' "   *Id.*   However, the court's conclusion was inconsistent with the record.

{¶ 59} Wright testified at trial that after graduating from the police academy and passing the state test in January 2016, he obtained a position with the Covington Police Department in March 2016. Tr. at 376-377. After serving there until September 2018, he joined the West Milton Police Department, where he was employed until he resigned on June 6, 2020. *Id.* at 377. Thus, prior to trial, Wright had been a police officer for only about four years. The time may have been less, since Wright was on leave from the police department when he was arraigned on February 11, 2020. Arraignment Transcript, p. 4. There is no indication in the record that Wright returned to work again before he resigned in June 2020.

{¶ 60} Wright did make the statements at trial that the court cited, i.e., that he had worked his own cases and due to his training, education, and experience, "knew what helps a case and hurts a case." However, Wright also stated that the police department called the prosecutors a lot to help with whether charges should be filed. Tr. at 400. When asked if he had called the prosecutors on every charge, Wright said, "Not on every charge. I think there's a wide range of things you're dealing with, especially with me being a road patrol officer. I'm dealing more with traffic stops, stuff like, especially on night shift." *Id.*

{¶ 61} Admittedly, Wright was a police officer, but there was no evidence in the record that he had worked on cases involving child sex abuse, forensic data analysis, child psychology, or DNA, nor was there evidence that he had any particular expertise in evaluating these complex areas. Instead, Wright was on road patrol, dealing with more routine matters like traffic violations.

{¶ 62} The trial court also discounted the affidavits of Wright, Mother, P.W., and

A.W., with respect to counsel's erroneous advice about the indictment and trial outcome, failure to investigate, failure to prepare for trial, and failure to call suggested witnesses, because "Defendant asserted this issue on direct appeal," i.e., had asserted trial counsel's ineffective assistance. Decision at p. 15. Again, for the reasons stated, this was incorrect. Since the affidavits raised matters outside the record, they were not barred even if the same point was raised on direct appeal. *Blanton*, Ohio Slip Opinion No. 2022-Ohio-3985, __ N.E.3d __, at ¶ 41.

{¶ 63} We do note that the family affidavits, even if credible, did not appear to be significant, because the opinions of Wright or his family or their conversations with trial counsel were not particularly important in deciding if counsel rendered ineffective assistance. A trial attorney's representations to a client might be more relevant in a situation where counsel incorrectly advised a client to plead guilty to charges or misled the client in that respect. *E.g. Calhoun*, 86 Ohio St.3d at 283, 714 N.E.2d 905; *see also Buhrman*, 2d Dist. Greene No. 2003-CA-55, 2004-Ohio-1016, at ¶ 6 (petitioner alleged the State breached a plea agreement by failing to present an account of his cooperation to the Bureau of Prisons). Where a client claims he or she did not voluntarily enter a plea, what trial counsel said to the client could be important. Likewise, if the State is alleged to have breached a plea agreement, what was said or done could be critical. The importance is less clear here.

{¶ 64} The final point Wright raises under this section relates to a missing video. According to Wright, the State provided trial counsel with videos of three separate pretrial interviews. The videos included K.W.'s interview with Lt. Moore, which took place

several weeks after the first two interviews with Det. Cooper.

{¶ 65} Moore's interview with K.W. was contained in separate video files, and the final file cut off abruptly immediately after K.W. was asked why she had delayed reporting the sexual abuse. Appellant's Brief at p. 13. When Wright's appellate counsel reviewed the video he had received from trial counsel, he noticed the problem. However, when Wright's trial counsel was contacted about this, he said he had no other videos of that interview. *Id.* *See also* App. at A-89-91 (March and April 2022 emails between Wright's appellate and trial attorneys). Appellate counsel was then able to obtain a complete copy of the video from the prosecutor, and, according to Wright, it contained relevant statements by K.W. Appellant's Brief at p. 13.

{¶ 66} Wright's post-conviction petition included an affidavit from Mark Satawa, an experienced criminal defense lawyer, who stated that based on trial counsel's failure to ask the State for the missing part of the video, "it is apparent that trial counsel did not bother to watch the complete interview of the alleged victim in the case. That amounts to a fundamental failure of defense counsel and cannot be justified in any way." Petition, Satawa Aff., ¶ 13.

{¶ 67} In its decision, the trial court rejected Satawa's affidavit because it was "cumulative" on the issues raised on direct appeal (referencing ¶ 13) and failed to "materially advance" the ineffective assistance claim. Decision at p. 16. As the only example of the latter point, the court discussed the incomplete video. The court noted that a transcript of the video had been provided to the court and that, because defense counsel asked K.W. at trial about specific statements she had made in the interview, "[i]t is apparent, therefore, that even if counsel did not procure the entire video interview, he

had access to the transcript prior to trial." *Id.* at p. 17, referencing Tr. at 119 and 123. However, the record does not contain any evidence that a full transcript of the incomplete video was available before trial or that trial counsel had any transcripts of videos. When the court referred to the fact that it had been provided with a transcript, it was clearly referring to the transcripts that had been submitted as part of the sealed appendix.

**{¶ 68}** The incident that prompted K.W. to report sexual abuse occurred at some point on December 8-9, 2019 (meaning Sunday night into Monday morning), when, according to K.W., Wright came into her bedroom in the middle of the night. K.W. was wearing clothing, including a red shirt, pink shorts, and orange underwear. *Wright,* 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, at ¶ 9. Our opinion noted that "K.W. testified that she was lying on her back, and Wright was on top of her, and her clothes were still on, but then Wright's pants 'came off.' She stated that Wright was naked and his whole body was on top of her. K.W. stated that Wright 'was like moving back and forth on top of me'; after five minutes Wright took her underwear off and 'put his private part in [her] private part.' " *Id.* K.W.'s physical examination on December 10, 2019, was normal, and the only physical evidence consisted of "touch" DNA on the waistband of the orange underwear. The touch DNA yielded a DNA mixture of two individuals, from which K.W. and Wright could not be excluded. *Id.* at ¶ 33-36 and 53.

**{¶ 69}** Regarding the parts of the record to which the trial court referred, defense counsel asked K.W. at p. 119 if she was aware that there were video reports of her interviews, and K.W. said, "Yes." Counsel then asked if K.W. understood that "[t]this rubbing [on her orange underwear] is absent from that incident [of December 8-9]." *Id.*

{¶ 70} On the other page the trial court cited (p. 123), trial counsel asked K.W. about sexual acts she had reported, including that Wright would ejaculate onto her back and chest. When K.W. stated that she did not recall saying that Wright had ejaculated on her chest, counsel said, "You said it was on both sides during your interview." *Id.* The interview referenced at p. 123 of the transcript refers to K.W.'s initial interview on December 10, 2019. *See* App., Dec. 10, 2019 interview transcript, p. 30, 46, and 47-48 (which describe Wright ejaculating on K.W.'s back, stomach, and "private area," not her chest). This is the only interview in which K.W. described this event.

{¶ 71} As part of the appendix to the post-conviction petition, Wright submitted transcripts of the video interviews. *See* App. at p. 286-332. The transcripts included: (1) a 50-page transcript of Det. Cooper's initial interview with K.W. on December 10, 2019; (2) a 58-page transcript of Det. Cooper's December 11, 2019 interviews with K.W.'s maternal grandmother (J.B.), K.W., and Mother; (3) a 27-page transcript of Lt. Moore's interview with K.W., which took place several weeks after the first two interviews; and (4) a complete transcript of the same Moore interview, which was about 11 pages longer.

{¶ 72} The 27-page transcript ended abruptly at the end of "file 2," with Moore asking K.W. why she did not come forward earlier. The complete transcript of the same interview is labeled by time rather than page numbers, i.e., it begins with "0.00" and ends at "1:36:31." The part where the transcript ends on the incomplete copy is located at 1:00:31-1. After that point, the video continued for more than 36 minutes. During that time, Lt. Moore asked questions for about 16 more minutes. This resulted in 11 more transcript pages.

{¶ 73} As noted, K.W. did not discuss the ejaculation incident during any interviews

after the first interview, so the trial reference to this incident does not indicate that Wright's trial attorney "had access to the transcript prior to trial" (or even watched the later interviews). Decision, p. 16. In fact, there was no evidence that written transcripts were ever available prior to or during trial, as no transcripts were part of the trial court record. Moreover, concerning counsel's reference to the fact that K.W. did not discuss rubbing during her interviews, counsel did not refer to any particular video during the exchange; he simply referred to the fact that the "rubbing" on her underwear was not part of the December 10, 2019 incident. Finally, the interview videos were also not admitted into evidence and were not part of the record that would have been available on appeal. *See* Tr. at 307-308 and 405-407 (where the trial court admitted evidence).

{¶ 74} Thus, contrary to the trial court's statement, there was no evidence that Wright's attorney had access to anything before trial other than the videos themselves, which included the incomplete video, not the complete video. Accordingly, the court's stated reason for rejecting attorney Satawa's affidavit was not based on sound reasoning.

{¶ 75} The court also rejected Satawa's affidavit as "cumulative." However, this conclusion was unsupported by sound reasoning, because the affidavit was based on matters that were outside the trial court record.

{¶ 76} It is true that Wright raised ineffective assistance of trial counsel during his direct appeal, and we considered and rejected this claim. *See Wright*, 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, at ¶ 167-197. On appeal, we noted that:

> The State also asserts that there is no evidence in the record to substantiate Wright's claims that defense counsel did not consult with or

make efforts to secure a DNA expert, a medical doctor other than Dr. Holland, or a forensic child psychologist. The State contends that Wright essentially concedes this point in a footnote, commenting that this argument is an effort to preserve the record "for a potential post-conviction relief argument at a later date."[2]

*Id.* at ¶ 173.

**{¶ 77}** In the referenced footnote (footnote 2), we noted that:

Footnote 9 of Wright's brief states that he recognizes that his claims of ineffective assistance of counsel regarding Liker and Miceli, counsel's failure to consult with and /or call a DNA expert, and the choice to call Holland (and not someone more qualified) "may well require" evidence that is outside the record and would have to be considered in post-conviction proceedings. "He nonetheless raises them here to the extent the record reflects the outcome of these decisions, if not the basis. These claims otherwise [may] be deemed defaulted and/or res judicata upon later review."

*Id.* at ¶ 173, fn. 2.

**{¶ 78}** "Cumulative" has a number of meanings, but the common meaning most applicable here is "tending to prove the same point." *See* Merriam-Webster Dictionary, "Cumulative," https://www.merriam-webster.com/dictionary/cumulative (accessed on July 20, 2023). From a global perspective, the point in the post-conviction petition and on direct appeal would be the same, i.e., ineffective assistance of counsel. However, since the post-conviction petition, including Satawa's affidavit, relied on matters outside the trial record, it would not properly be classified as "cumulative." And again, Wright did not

have to definitively prove deficiency or prejudice to obtain a hearing. *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 27.

### D. Failure to Consult or Call Expert Witnesses

**{¶ 79}** Under this discussion (labeled "Grounds 2-5"), Wright challenges the trial court's rejection of the affidavits from Dr. Kessis, Dr. Levine, Swauger, and Dr. Thompson. We will separately discuss the court's decision and the appellate arguments that concern each expert.

### 1. Dr. Kessis

**{¶ 80}** Dr. Kessis is the DNA expert Wright retained after trial. The trial court rejected Dr. Kessis's affidavit because the petition raised "precisely the same argument" as the direct appeal, "albeit with an additional or alternative foundation." Decision at p. 22. The court did not discuss what the additional foundation might be, other than its brief prior reference to assisting the defense in "exposing the decision not to swab and test the crotch area for DNA" and to the claim that the other male in the house should have been tested, since K.W.'s underwear was taken from a laundry basket. *Id.* at p. 21. The court also described Kessis's testimony as "cumulative" and again recited the *Nicholas* standard as a basis for rejecting the affidavit.

**{¶ 81}** We have already discussed the court's error in applying *Nicholas* and need not further address it. The same observation applies to the court's use of "cumulative" and its reference to Wright's making "precisely the same argument" as he did on direct

appeal.   As noted, a petitioner is permitted to make the same or similar arguments as were made on direct appeal, so long as there is evidence outside the record.

{¶ 82} In the post-conviction petition, Wright contended that trial counsel had been ineffective in failing to consult with and call a DNA expert to testify at trial and instead relying on cross-examination of the State's expert.   Petition, p. 34.   Wright further claimed this prejudiced him because the trial "turned on the respective credibility of K.W. and Wright," and the State's expert's "DNA testimony provided the only independent physical evidence and was critical to the State's case."   *Id.* at p. 36.   This was true.

{¶ 83} On direct appeal, Wright raised several instances where the State allegedly committed prosecutorial misconduct during closing argument.   We reviewed the issue for plain error only because no objections were made at trial.   *Wright,* 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, at ¶ 131 and 134.

{¶ 84} Among the alleged misconduct was the State's reference to Wright as a "monster."   *Id.* at ¶ 143-144.   While the State conceded that this " 'took closing argument to a level that was too personal,' " it offered several reasons why the jury was nevertheless not "inflamed" and therefore did not act out of passion.   *Id.* at ¶ 144.   In this regard, the State pointed out "that this was not a case based only on the word of the accuser against the word of the accused and that the DNA evidence was *'powerful evidence'* against Wright, making it 'less likely' that the State's reference to Wright as a monster impacted the verdict."   (Emphasis added.)   *Id.*

{¶ 85} As noted, the affidavit of Dr. Kessis, a DNA expert, was attached to the petition.   The appendix that was submitted also included Dr. Kessis's affidavit, a 13-page report prepared on June 22, 2022, and Kessis's six-page curriculum vita ("CV").

According to the CV, Dr. Kessis obtained a Ph.D. from John Hopkins University in molecular biology and virology in 1993 and was a postdoctoral fellow at the John Hopkins University School of Medicine, Department of Gynecologic Pathology, from 1993 to 1996. Kessis was then a research associate and assistant scientist from 1996 to 1998 in the John Hopkins University School of Public Health, Department of Molecular Microbiology. And, from 1998 to the time of the affidavit, Wright was the principal of Applied DNA Resources ("ADR"). CV, p. 1-2 and Kessis Aff., ¶ 1.

{¶ 86} Over the previous 35 years, Kessis had designed, used, witnessed, and reviewed a wide range of DNA typing technologies utilized in research, medical and forensic communities and had, in conjunction with his current and former positions, "extracted DNA from thousands of DNA specimens and had performed an equal number of Polymerase Chain Reaction (PCR) and Short Tandem Repeat (STR) procedures." *Id.* at ¶ 2-3. Kessis had also been qualified to testify 72 times at the federal and state levels, including in Ohio, as an expert in the use and application of DNA typing. *Id.* at ¶ 4.

{¶ 87} For purposes of his review, Kessis had reviewed all the material in the case relevant to DNA (including underlying data worksheets and notes) as well as post-trial independent testing performed by DNA Diagnostics Center. *Id.* at ¶ 5 e. and f. and 8 f., and App., ADR Report of Findings, p. 2. Based on his review, Kessis concluded that "a DNA expert was essential to an effective defense strategy as a pretrial consultant and an expert defense witness at trial."

{¶ 88} While K.W. reported prior instances of abuse, the December 8-9, 2019 incident was the only one for which physical evidence was able to be gathered. After

Det. Cooper interviewed K.W. on December 10, 2019, Lt. Moore searched Wright's home the same evening. Tr. at 179. Moore's purpose was to locate bedding material and clothing K.W. had described wearing at the time, which included pink shorts, underwear, and some sort of red shirt. *Id.* at 192. During the search, Lt. Moore removed and collected a pair of pink shorts, a couple of different red shirts, and two or three pairs of underwear. *Id.* at 184. He also collected the bedding from K.W.'s bed and two pairs of gray sweatpants from Wright's bedroom drawer, as K.W. had said Wright wore gray sweatpants the night of the rape. *Id.* at 186.

{¶ 89} During a second interview on December 11, 2019 (after the search), K.W. mentioned the underwear and was able to pick out a couple of pairs she may have worn that night. *Id.* at 247 (testimony of Det. Cooper). The items that had been collected were sent to the MVRCL for testing. As indicated, the only item bearing any DNA (the touch DNA) from which Wright could not be excluded was a pair of orange and yellow underwear.[2] The State's expert, Mary Barger, stressed that "while touch DNA can theoretically spread from one object touching another, 'you would have to have a very,

---

[2] According to the transcripts of the interviews provided in the appendix, K.W. stated during her initial interview with Det. Cooper that at the time of the December 8-9 incident, she had on pink shorts with a white stripe on the bottom and thought she had on a red shirt. December 10, 2019 interview transcript, p. 24. At that time, K.W. said she thought she had on a red t-shirt *and said she did not know what underwear she was wearing. Id.* Following the search, Det. Cooper interviewed K.W. again on December 11, 2019, and showed her a couple of pictures of the clothes and shorts she had mentioned. Dec. 11, 2019 interview, p. 12. When Cooper asked K.W. what underwear she had been wearing, she said, "It was one of those. *I think it was this one or that one. I can't remember."* * * * *It was one of those two." Id.* It was only at trial that K.W. stated that at the time of the December 8-9, 2019 rape, she had had on the orange and yellow underwear (the only article on which DNA from which Wright could not be excluded was found). Tr. at 71-72 and 75. Trial counsel did not ask K.W. about the statements she had made during the interviews with Det. Cooper.

very large amount of DNA left on the original item for another individual to touch that item and pick up that person's DNA and have it detected on another item.' " *Wright*, 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, at ¶ 38. Barger also stated that "she would expect to find a significant amount of K.W.'s own DNA, because 'when you're wearing your own clothing you're constantly moving; you're sloughing off your own skin cells on the clothing that you're wearing," but picking up the DNA of another individual in that location would be "fairly rare" without "a heavy amount of contact.' " *Id*. at ¶ 36. Our opinion further noted the State's argument in closing that the amount of touch DNA on K.W.'s underwear was "unexpected" and that Barger was "basically taken aback when she found this amount of touch DNA on the under garment." *Id.* at ¶ 132.

{¶ 90} Dr. Kessis's affidavit and report were diametrically opposed to Barger's testimony. Among other things, Kessis stated that:

> There was not a significant amount of DNA on the waistband of KW's underwear, as claimed by Barger. The true amount of DNA present was equivalent to the amount of DNA present in no more than 25 or 30 human male cells.
>
> Barber testified that the amount of DNA found on the waistband of KW's underwear was inconsistent with innocent transfer and more consistent with vigorous rubbing. These assertions were scientifically inaccurate and misleading.

Petition, Kessis Aff. at ¶ 8 b. and c.

{¶ 91} In his report, Kessis further explained that:

Regarding the case file materials provided to me, specifically the documentation associated with the quantification of the DNA extracted from the evidence (*Appendix 8*), demonstrated that the concentration of the DNA extracted from item 3B (orange underwear) was 3pg/ul. To put this in context, the amount of male DNA in one human cell is approximately 3pg, and 400 to 500 average sized human cells can fit within the confines of the head of a pin. Given that the total volume of DNA recovered from this pair of underwear was probably no more than 25ul total, it follows that the total amount of male DNA recovered from the underwear was the equivalent to the amount of DNA present in no more than 25 or 30 human cells. It is therefore my opinion that Ms. Nestor's [the MVRCL's lab technician's] characterization to Detective Cooper that 'an awful lot of DNA' was present on the underwear was demonstrably misleading.

App., ADR Report of Findings at p. 8-9.

**{¶ 92}** Dr. Kessis's report also stated that Barger's trial testimony that "the DNA detected on the evidence was 'a lot' or more than you would expect to find' " was "misleading on several level[s]." (Emphasis sic.). *Id.* at p. 10, quoting Tr. at 219, line 7. Kessis noted that the PCR testing used in this case detected "extremely low levels of DNA" and "can easily detect DNA innocently left on an item as a result of innocent transfer, secondary transfer, or even a contamination event within the laboratory." *Id.* Again, Kessis stressed that "in direct contradiction to Ms. Barger['s] testimony are the laboratory's quantification results indicating that the amount of male DNA detected on the orange underwear was in fact a nearly undetectable amount." *Id.*

{¶ 93} Additional DNA testing was done post-trial using the male DNA of Wright's two other children (one adopted and one biological), and these results revealed that neither child was responsible for the male DNA found on K.W.'s pink shorts. Likewise, Wright had been excluded as a contributor. *Id.* at p. 10-11. Kessis noted in his affidavit that:

The DNA detected on DW's orange underwear (attributed to Petitioner) was more than likely deposited by casual or innocent transfer, based on:

i. The environment from which the evidence was collected (a laundry basket);

ii. The finding of an infinitesimal amount of DNA attributed to Petitioner on the item; and

iii. The finding of an unknown male's profile detected on the pink shorts collected from the same laundry basket. The quantity of the unknown DNA is roughly the same quantity of DNA attributed to Petitioner. If this unknown DNA were innocently transferred (and that appears to be undisputed), it is equally likely that Petitioner's DNA was innocently transferred. This fact directly contradicts Barger's assertions that the amount of transfer made innocent transfer unlikely.

Petition, Kessis Aff. at ¶ 8 e.(i.)-(iii.).

{¶ 94} These items were outside the record, as the State's expert did not testify about the meaning of the amount of DNA found, and no DNA testing of Wright's male

relatives was conducted. Accordingly, the trial court erred in rejecting Kessis's testimony. This is not to say that Wright's post-conviction petition must prevail. However, given the lack of corroborating evidence other than the touch DNA, the petition was sufficient on its face to raise an issue on whether Wright had been deprived of effective assistance of counsel, and his claim depended on factual allegations that could not be determined by examining the trial record. *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 27.

{¶ 95} As a final matter, we note the State's argument that Dr. Kessis was not credible based on an Ohio case from almost 20 years ago in which a trial judge was not impressed with Dr. Kessis and discounted his fees. *See* State's Brief, p. 16-17 and Ex. 1 attached to the brief. The State also notes that, in a 23-year-old Michigan case, Dr. Kessis stated that he was a "forensic consultant" rather than a "forensic scientist." *Id.* at p. 17 and Ex. 2 attached to the State's brief. The State made these arguments in the trial court as well. State's Response at p. 14-16.

{¶ 96} In responding in the trial court, Wright offered a 2018 Ohio case in which the State called Dr. Kessis as an expert to testify during its case in chief because Kessis, while originally retained by the defense, " 'testified that the procedures and methods utilized by the BCI were accurately and reliably carried out. He further testified that the findings were consistent with the alleged facts surrounding the rape.' " Reply Brief and Memorandum in Support of Petition for Post-Conviction Relief ("Reply Memorandum"), p. 10, quoting *State v. Kopchak*, 5th Dist. Muskingum No. CT2017-0036, 2018-Ohio-1136, ¶ 9.

{¶ 97} None of these arguments are important here. What mattered was the

reliability and credibility of any expert with respect to this particular case. Moreover, while the State is critical of Dr. Kessis for consulting on DNA tests he did not personally conduct, the State's trial expert, Barger, did not actually perform the DNA tests; instead, the underlying tests were performed by others, and Barger only reviewed the results. *See* App., ADR Report of Findings at p 7 and 9-10 (noting that the MVRCL testing was done by other forensic scientists (Newton and Richards), and that Barger merely reviewed their results, while representing at trial that she (Barger) had conducted the tests).

{¶ 98} Based on the preceding discussion, the trial court erred in failing to hold a hearing at which Dr. Kessis could testify.

## 2. Dr. Levine

{¶ 99} Dr. Levine, a board-certified family physician active in private practice, was a former chief of medicine at the Detroit Medical Center and a clinical instructor and professor of family medicine at two universities. He was also experienced in providing care and treatment to persons complaining of sexual assault. Petition, Levine Aff., ¶ 1-3.

{¶ 100} Dr. Levine reviewed the trial materials and concluded that the testimony that K.W. "was sexually assaulted numerous times, including penile penetration within 24 hours of the SANE exam, is not supported by the physical evidence in this case." *Id.* at ¶ 8. In addition, Levine refuted various "generalized" statements of State witness Dr. Liker as applied to the particular facts, like the fact that the physical trauma resolved due to the lapse in time between the sexual contact and the exam; that lubricants may have been used, decreasing the possibility of anogenital injury (there was no evidence

lubricants were used); and that "[t]he sexually abusive contact resulted in no injury." *Id.* at ¶ 12 a., b., and f. Based on these and other similar points, Levine concluded "within a reasonable degree of medical certainty, the alleged trauma and sexual assault as described by the victim and then amplified by others, *did not occur.*" (Emphasis sic.). *Id.* at ¶ 15.

**{¶ 101}** In addition, Dr. Levine referenced a panel of doctors to whom he had presented this case. According to Dr. Levine, the panel uniformly concluded that the sexual abuse could not possibly have happened the way K.W. claimed and also agreed that "an expert could not, and should not, testify in court that a report of sexual assault is 'consistent,' or 'supported' in the face of an intact 'virginal' hymen on microscopic examination, as were the facts in this case." *Id.* at ¶ 16-18.

**{¶ 102}** The trial court rejected the panel's views as "hearsay" and because the panel members were not identified. Decision at p. 19. The court further rejected Dr. Levine's affidavit because the medical expert who testified at trial, Dr. Holland, addressed many of the same issues in testimony and expressed the opinion " 'to a reasonable degree of medical certainty on direct examination that there was no 'compelling evidence' that any vaginal penetration had occurred to K.W. and that, based upon what she described and the age of onset of abuse, Holland would have expected to see an abnormal exam in a majority of patients.' " *Id.* at p. 20, quoting *Wright,* 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, at ¶ 191.

**{¶ 103}** In this instance, we agree with the trial court. Typically, ineffective assistance of counsel claims involve failure to call experts. As noted, the Supreme Court of Ohio has distinguished between direct appeals, where the failure to call experts and

instead to rely on cross-examination does not constitute ineffective assistance of counsel, and post-conviction petitions, where failure to call an expert may be ineffective assistance. *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 35-36, quoting *Nicholas* 66 Ohio St.3d at 436, 613 N.E.2d 225.

{¶ 104} Wright contends that the trial court erred because Levine's testimony was relevant in showing that trial counsel had consulted with the wrong expert and that consulting another expert would have allowed counsel to learn that Dr. Liker's conclusions had not been credible.

{¶ 105} We have reviewed and compared the trial testimony of Dr. Holland with Dr. Levine's affidavit. *See* Tr. at 352-365. Having done so, we cannot conclude that the post-conviction petition was sufficient on its face to raise an issue whether Wright was deprived of effective assistance of counsel in this regard and that his claim depended on factual allegations that cannot be determined by examining the trial record. *Bunch* at ¶ 27.

{¶ 106} The effect of Dr. Holland's testimony may have suffered because he "had previously authored reports for defense counsel's office and * * * defense counsel's office had performed legal services for him in the past." *Wright*, 2d Dist. Miami No. 2021-CA-17, 2022-Ohio-1786, at ¶ 70. In addition, Holland's effectiveness may have suffered because trial counsel failed to provide him with the underlying records of K.W.'s medical exam at Dayton Children's Hospital. Instead, Holland was provided only with a PDF on Dr. Liker's interpretation of her Children's report. Tr. at 355, 361, 365, and 369-370.

{¶ 107} During the direct appeal, we reviewed these points in connection with Wright's claim that trial counsel had rendered ineffective assistance in deciding to use

Holland as an expert and in failing to provide him with medical records. We rejected these claims. *Wright* at ¶ 188-191. Regarding the latter contention, we stated that "[e]ven if we were to conclude (which we do not) that defense counsel's performance was deficient based upon counsel's failure to provide the hospital records to Holland, prejudice is not demonstrated. In other words, we cannot conclude that had defense counsel provided the hospital records to Holland, the jury would have found Wright not guilty." *Id.* at ¶ 191.

{¶ 108} Wright's post-conviction petition, insofar as it was based on Dr. Levine's affidavit, did not present a claim that "depended on factual allegations that cannot be determined by examining the trial record." *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 27. Therefore, the trial court did not err in rejecting Levine's affidavit as a basis for holding a hearing.

### 3. Forensic Cell Phone Evidence

{¶ 109} In his brief, Wright next contends that the trial erred in rejecting the forensic cell phone evidence offered by James Swauger, who was "an expert in the field of digital forensic analytics of electronic cell phone and computer data." Petition, Swauger Aff., ¶ 1.

{¶ 110} At trial, K.W. testified that on the evening of the December 8-9, 2019 rape, Wright showed her a video on his phone of two people having sex, and that this was not the first time he had shown pornography to her. Tr. at 69. K.W. did not describe the video in detail at trial, but in her interview with Det. Cooper on December 10, 2019, K.W. stated that the video was of "a girl and a guy," that the girl had on a white tank top and

had blonde hair, that the guy was "laying on the bed" but his face was not visible, that the girl just touched the guy everywhere and "sucked on it," and that that was what Wright wanted her to do.   December 10, 2019 interview transcript at p. 3, 12, 40, and 41.

{¶ 111} The police obtained a search warrant for Wright's cell phone and served it on Wright on December 12, 2019, which was two days after they interviewed K.W. for the first time.   Tr. at 252.   Det. Cooper, the lead investigator on the case, testified that the cell phone was forensically downloaded, logically and physically, and that a logical download provides what is on the phone – what you can see.   *Id.* at 253-254.   A file system download will obtain that information plus maybe some deleted files, but that depends on the cell phone provider.   And, a "physical download will then in turn pick up more deleted files if they're available, as well as the rest of the information picked up by the logical and file system."   *Id.* at 254.   Cooper further testified that "numerous things" had been deleted from Wright's phone. He stated that "[t]here were thousands of items deleted, * * * including 146 or 50" videos, and that there was no way of knowing when the items had been deleted.   *Id.* at 283.[3]   An implication from the testimony was that because Wright had the cell phone for two days after learning of the rape accusations, he had deleted any potentially incriminating videos or items from his phone.

{¶ 112} Another issue at trial was K.W.'s allegation that Wright had raped her the weekend prior to December 8, 2019.   According to K.W., that rape took place on November 30, 2019, which was a Saturday.   K.W. recalled at trial that the rape had occurred that day because she had a basketball game.   Tr. at 120.   When asked if the

---

[3] The Cellebrite Report that Det. Cooper generated on March 30, 2020, indicated that 147 videos had been deleted.   *See* App., Binary Intelligence Report ("BI Report"), p. 13.

Saturday rape had definitely happened, K.W. stated "Yeah, I remember telling them [the police] about Saturday, but I don't remember the words that I told them."  *Id*. at 121.  She also recalled that her brother's birthday party was the next day, on December 1, 2019. *Id*. at 121-122.  *See also id*. at 335-336 (Mother's testimony indicating K.W. had a basketball game on Saturday, November 30, 2019, and that the birthday party was on December 1, 2019).

{¶ 113} While Wright was not indicted for this rape, he presented his time-sheet from work, indicating that he had worked nights that weekend: Friday, November 29, 2019, from 7:00 p.m. to 7:00 a.m.; Saturday, November 30, 2019, from 7:00 p.m. to 7:00 a.m.; and Sunday, December 1, 2019, from 11:00 p.m. to 7:00 a.m.  On Sunday, officers were allowed to go in a few hours late and could choose the hours.  Wright went in later that Sunday because of his son's birthday party.  *Id*. at 364 and Defendant's Ex. F. During trial, Wright's counsel did not provide any expert testimony about the cell phone.

{¶ 114} After trial, Swauger conducted a forensic analysis of Wright's cell phone "(and related cloud accounts)" to determine if the phone had been used "to display a pornographic video on the evening of 12/8/2019 or early morning of 12/9/2019."  Petition, Swauger Aff., ¶ 2 a.  Swauger did not include a CV, but his listed credentials indicated that he was a CFCE (Certified Forensic Computer Examiner); a CISSP (Certified Information Systems Security Professional); a CEECS (Certified Electronic Evidence Collection Specialist/Certified Forensic Computer Examiner); a DFCP (Digital Forensics Certified Practitioner); EnCE (EnCase™ Certified Examiner); and a CIE (Council-Certified

Indoor Environmentalist). App., BI Report at p. 1.[4]

{¶ 115} Swauger was also asked to conduct a forensic review of the cell phone to "identify any access to pornographic videos which match the description given by K.W."; to conduct a forensic analysis of the cell phone "to investigate the reported 147 deleted videos"; and to conduct an analysis of "Google Location History data to determine Kevin Wright's whereabouts during the night of 11/30/2019 through the morning of 12/1/2019." Swauger Aff. at ¶ 2 b., c., and d.

{¶ 116} In addition to reviewing the trial transcript, K.W.'s pretrial interviews with Lt. Moore and Det. Cooper, the Cellebrite physical image of Wright's phone that was received from Det. Cooper, and a Cellebrite report package dated 3/30/2020 and received from Det. Cooper, Swauger reviewed Google Cloud data from Wright's email address and Wright's Amazon order history. *Id.* at ¶ 3 a.-f. The cloud data and Amazon order history were outside the record. Furthermore, while Det. Cooper testified generally about downloading data from the cell phone, he did not discuss the Cellebrite report at trial, nor did he discuss the content of the phone other than noting that thousands of items, including around 146 to150 videos, had been deleted.

{¶ 117} After examining the items listed above, Swauger concluded that:

a. Contrary to KW's trial testimony and the allegations in her pretrial statements, there is no evidence that Kevin Wright's cell phone

---

[4] *See* https://www.iacis.com/certification/cfce/; https://www.isc2.org/Certifications/cissp/ Certification-Exam-Outline; https://www.digitalforensics.com/certifications/certified-electronic-evidence-collection-specialist;https://dfcb.org/certification-information/; https://www.opentext.com/learning-services/learning-paths-encase-certifications; and https://indoorsciences.com/certifications/certified-indoor-environmentalist/ (all accessed on July 25, 2023).

*displayed or played* any video (pornographic or otherwise), during [the] evening of 12/8/2019 or morning of 12/9/2019;

b. There is no evidence that any pornographic videos matching KW's description exists on (*or was ever accessed from*) Kevin Wright's cell phone before or after 12/8/19 and 12/9/19;

c. Contrary to Cooper's testimony at trial, the Cellebrite report stating that 147 videos were deleted from Kevin Wright's phone is not accurate.

d. There is no evidence that Kevin Wright or anyone else intentionally deleted files from Kevin Wright's phone;

e. Contrary to K.W.'s trial testimony (claiming an instance of rape), Kevin Wright was not at home the night of 11/3019 through the morning of 12/1/19.

(Emphasis added). Swauger Aff. at ¶ 4 a.- e.

{¶ 118} A 20-page report from Swauger explaining his findings was included in the appendix. Pages 7 to 11 of the report outline several things, including the following points: (1) the cell phone and Wright's Google Cloud account were examined to compile a chart indicating when the phone was in use and when the phone was asleep during the relevant times on December 8 and 9, 2019, and during the relevant times, "the review failed to identify any instance where a video was viewed or accessed" on Wright's phone; 2) various cached files and other objects were deleted from the phone when it was in the Sheriff's possession; and 3) Swauger used multiple forensic applications to parse the internet browsing history and none identified any activity on the night in question. A

"thorough manual review of Chrome database records was performed to verify that no browsing activity occurred on the night of 12/8/2019 or early morning hours of 12/9/2019. This database review confirmed that, prior to the time period in question, the Chrome Internet Browser was last used on 12/8/2019 at 8:49:30 am (EST).  The next usage occurred after the time in question, on 12/9/2019 at 10:29:58 (EST)."  App., BI Report at p. 7-11.

**{¶ 119}** The report further noted that, "Given the specific allegation that a pornographic video was displayed on the phone, the Samsung Video Player application (com.samsumg.android.video.player.activity.Movie Player) usage history was manually investigated.   This is the built-in system video player application for the Samsung Galaxy device series.   This manual review confirmed that the video player was not used at any time on 12/8/2019 or 12/9/2019.   The last usage, prior to the time-period investigated, was 12/7/2019 at 11:19 am (EST)."   *Id.* at p. 11.

**{¶ 120}** Swauger further concluded that there was "[n]o evidence that a video matching [KW's] description exists or *was accessed* from Kevin Wright's phone." (Emphasis added.)   *Id.* at p. 12.   Swauger detailed his investigation, which included use of various artificial intelligence/machine matching image recognition technologies "to identify any pictures or videos depicting possibly nudity, SCAM (Child Sexual Abuse Material), or adult content"; manual review of all videos resident in the device-file system, "a review of all internet searches, URL visits, cache, and cookies for evidence of access to pornographic material" and "a forensic keyword search for ASCII terms related to adult content and SCAM."   *Id.*

**{¶ 121}** Swauger noted that "[a] review of all internet activity and keyword search results identified four instances of access to pornographic videos. Each of these four videos was accessed via the website ww.pornhub.com on 7/14/2019 through 7/16/2019. None of the accessed videos match the description given by [KW]." *Id.*

**{¶ 122}** In addition, Swauger stated that the vast majority of the photos that Det. Cooper had reported as deleted "were not actually deleted. They were found in active state on the local device-file system and could be viewed using the Cellebrite report generated by Detective Cooper." BI Report at p. 13. Due to a fault in the Cellebrite program that Cooper used, "ALL files residing in both the Google Photos cloud repository and the local file-system" were "incorrectly labeled as deleted." (Capitals sic.) *Id.* After analyzing the files, "of the 147 videos labeled as deleted, only 10 were actual deleted files which could not be viewed. These 10 files were located in system directories not directly accessible to the user under normal circumstances." *Id.* at p. 16.

**{¶ 123}** The final part of the report used Google location history data acquired by the Google Takeout service for Wright's email account, which was associated with Wright's cell phone. *Id.* at p. 16. Network usage statistics showing connections to WIFI networks and summarizing data sent and received indicated that Wright left home at 6:43 p.m. on November 30, 2019, and did not return home until 7:55 a.m. on December 1, 2019, other than for a brief 24-minute period when he came home to deliver take-out food that had been arranged via text between Wright and Mother. *Id.* at p. 17.

**{¶ 124}** The trial court rejected Swauger's affidavit and report because "no pornographic videos were found on Defendant's phone." Decision at p. 18. However, this missed the point that facts outside the record revealed that the phone had not

accessed or played any pornographic videos.   Specifically, K.W. did not say that Wright's phone had such a video stored on it; she said that Wright had played a video.

{¶ 125} The trial court also noted that the issue "leans on trial strategy," because trial counsel had indicated during pretrial conferences that "Digital Cowboy" was conducting forensics on the cell phone.   However, trial counsel did not call an expert. *Id*.

{¶ 126} Again, this was the wrong focus.   There was no evidence in the record concerning the content of any pretrial conferences about Digital Cowboy's investigation or report other than that such an entity was subpoenaed but was not called to testify. Furthermore, as noted, the Supreme Court of Ohio has rejected the idea that post-conviction claims are barred if based on evidence that was available to the defense at trial.   *Blanton*, Ohio Slip Opinion No. 2022-Ohio-3985, __ N.E.3d __, at ¶ 59-60.

{¶ 127} In *Blanton*, trial counsel sought independent testing of a rape victim's clothing before trial but received a report that did not support the defense theory about stains on the clothing.   The defense, therefore, did not present evidence or testimony about the expert report at trial.   *Id*. at ¶ 55.   In the post-conviction petition, the defendant had a new theory about the import of the stains and claimed trial counsel had been ineffective in failing to call the expert to testify.   *Id*. at ¶ 57.

{¶ 128} The State argued that the petition's dismissal was proper on res judicata grounds because the defendant knew about the expert at the time of the direct appeal. *Id*. at ¶ 59.   However, the Supreme Court of Ohio rejected the statement that the State relied on, i.e., that " '[f]or a defendant to avoid dismissal of the petition by res judicata, the

evidence supporting the claims in the petition must be competent, relevant, and material evidence outside the trial court's record, *and it must not be evidence that existed or was available for use at the time of trial.' "* (Emphasis sic.) *Id.*, quoting *State v. Adams*, 11th Dist. Trumbull No. 2003-T-0064, 2005-Ohio-348, ¶ 39.

**{¶ 129}** In this regard, the Supreme Court of Ohio commented that:

The language on which the state relies sets forth the general rule of res judicata. But that is not the rule we apply to postconviction claims alleging ineffective assistance of trial counsel. There is no requirement that to overcome a res judicata bar, the evidence on which such a claim is based must have been unknown or unavailable to the defense at trial. Indeed, the very premise of this sort of ineffective-assistance claim is that counsel erred by failing to present exculpatory evidence that was available to him. When the trial record does not demonstrate the existence of such evidence, a defendant would not have been able to raise such a claim on direct appeal. Accordingly, such a claim may properly be brought in a postconviction-relief petition.

*Blanton* at ¶ 60.[5]

---

[5] Other districts, including our own, have used this rejected language when considering post-conviction petitions. *E.g., State v. Bowman*, 2d Dist. Darke No. 2023-CA-3, 2023-Ohio-2078, ¶ 15, quoting *State v. Jackson*,10th Dist. Franklin Nos. 06AP-631, 06AP-668, 2007-Ohio-1474, ¶ 21; *State v. Wade*, 11th Dist. Lake No. 2021-L-049, 2022-Ohio-1006, ¶ 23; and *In re D.J.,* 9th Dist. Summit No. 29119, 2020-Ohio-3528, ¶ 13. Use of such language in post-conviction situations is no longer correct, nor is it correct to affirm denial of post-conviction petitions on that basis. *See Bowman* at ¶ 19 (affirming denial of petition, among other reasons, because petitioner "did not rely on any evidence that did not exist or was not available to him for use at trial").

**{¶ 130}** Thus, whether Wright consulted an expert prior to trial had no bearing on his post-conviction petition. Again, evidence was presented outside the record which tended to support Wright's testimony as to the fact that he had not been home the night of the alleged November 30, 2019 rape. While he was not charged with that rape, the alleged incident did bear on K.W.'s credibility. This is not to imply that any witness was credible or not credible. The point is that credibility was the primary issue at trial.

**{¶ 131}** Swauger's affidavit and report also cast doubt on Det. Cooper's testimony. As indicated, the issue was whether the petition was sufficient on its face to raise an issue as to whether Wright had been deprived of effective assistance of counsel and whether his claim depended on factual allegations that could not be determined by examining the trial record. *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 27. Here, Swauger's evidence was outside the record, and the petition was sufficient on its face to raise issues about whether Wright had been deprived of effective assistance of counsel.

**{¶ 132}** We note that the trial court also remarked that K.W.'s testimony about the exact date of the November 30, 2019 rape was equivocal. Decision at p. 18, citing Tr. at 140-141 and 274. However, K.W.'s initial trial testimony about the November 30, 2019 date was not equivocal. Tr. at 120-122 and 124. At p. 140-141, the State did ask K.W. if she told Det. Cooper on multiple occasions that she wasn't sure about the November 30 date, and K.W. said "yes." However, at p. 274 (the page the court cited), the following exchange occurred with Det. Cooper regarding the Saturday, November 30, 2019 incident:

Q: She [K.W.] said she remembered that it happened that night because she had a basketball game?

A. She said she was not sure.

Q. No, she said she remembers it because of the basketball game in the interview.

A. Correct, yes, she did recall a basketball game, yes.

Q. You were trying to link up an event to recall her memory?

A. Yes.

Tr. at 274.

{¶ 133} There was no testimony that a basketball game occurred on any day other than Saturday, and that was the reason for the focus on the November 30, 2019 date. In any event, as we have stressed, Wright did not have to definitively prove deficiency or prejudice to obtain a hearing. *Bunch* at ¶ 27. The trial court therefore erred in failing to hold a hearing at which Swauger could testify.


4. Dr. Thompson

{¶ 134} The final expert that Wright discussed was Dr. Thompson, who was an expert in the field of child psychology. Wright's counsel did not present such an expert at trial and only briefly cross-examined the State's psychology expert, Dr. Miceli. *See* Tr. at 239-242.

{¶ 135} Dr. Thompson was board certified in clinical psychology and had practiced for more than 30 years as a child clinical psychologist. Petition, Thompson Aff., ¶ 2-3. Dr. Thompson also prepared a report, which was included in the appendix. Based on

his review of various materials, including discovery materials and interviews with K.W. (which were not in the trial record), Thompson found that Det. "Cooper departed markedly from best practice questioning styles during the December 10 and December 11, 2019 interviews," and that "Lt. Moore, in his January 2020 interview, continued that departure from best practice." App., Dr. Thompson Report, p. 11. Thompson also stated that including a worker from victim witness in the December interview was "an even further departure from best practice." *Id.* In the report, Thompson noted that he had "testified extensively in the areas of child forensic interviews, best practice interviewing, child memory, suggestibility, and influences on child memory in numerous counties in Wisconsin" and in several states, including Ohio, Michigan, and Indiana. *Id.* at p. 3.

**{¶ 136}** Additionally, Dr. Thompson noted that K.W.'s therapy records were not available. Thompson stressed that, if retained, he would have educated defense counsel on the need to access treatment records and "would have been available to testify at trial concerning the effects of therapy services on a child's memory and event reports." *Id.* at p. 11. Thompson further stated that if retained as an expert, he would have been able to rebut the testimony of the State's expert, Dr. Miceli. In this regard, Thompson outlined certain statements of Dr. Miceli that were incorrect, as well as other statements that were not challenged at trial. *Id.* at p. 4.

**{¶ 137}** The trial court did not discuss the content of Dr. Thompson's affidavit and report, but it rejected the affidavit because Wright had already raised defense counsel's incompetence in examining Dr. Miceli on direct appeal. Decision at p. 18. However, again, the court's position was incorrect because "claims that rely on evidence outside

the record may be heard on postconviction review even if similar claims have been previously raised and adjudicated against the petitioner in his direct appeal." *Blanton*, Ohio Slip Opinion No. 2022-Ohio-3985, __ N.E.3d __, at ¶ 41.   As noted, Dr. Thompson's opinions were based on matters that were not available for review on direct appeal.

{¶ 138} The trial court also found that Thompson's opinions implicated nothing new, were "cumulative," and did not provide "substantial grounds for relief," again without discussing any particular points.   Decision at p. 18.   As we have said, even if an argument on post-conviction involves the same global issue as the direct appeal, i.e., ineffective assistance of counsel, the claim would not be properly classified as "cumulative" if it is based on matters outside the trial record.   And finally, as we have stressed, Wright did not have to definitively prove deficiency or prejudice to obtain a hearing.   *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 27. Accordingly, the trial court erred in denying the petition without a hearing at which Dr. Thompson could testify.

E.   Failure to Challenge Search Warrant

{¶ 139} Wright's next ground concerns the trial court's rejection of his claim that trial counsel had been ineffective in failing to file a motion to suppress to challenge the search warrants.   Wright notes that this argument could not have been raised on direct appeal because the warrant affidavits were not admitted into evidence before or during trial.   Appellant's Brief at p. 21.

{¶ 140} The trial court rejected this claim for two reasons.   First, the court found that while the affidavits and search warrant were provided in the sealed appendix, the

claim was based on a "bare allegation" because Wright had failed to "authenticate" these documents. Decision at p. 7. The court further rejected Wright's argument because it found that "common sense" supported the nexus between K.W.'s statements and the items listed in the warrant. *Id.* at p. 9.

{¶ 141} In response, Wright argues, first, that the documents were properly authenticated and that no one questioned the authenticity of the warrant documents, and second, that a sufficient nexus between the allegations and evidence sought did not exist.

{¶ 142} As a preliminary point, we disagree with the trial court's finding that the search warrant materials were not properly authenticated. As pertinent here, R.C. 2953.21(A)(1)(b) states that "A petitioner * * * may file a supporting affidavit and other documentary evidence in support of the claim for relief." The statute does not specify standards for documentary evidence. Nonetheless, as a general rule, Evid.R. 901(A) states that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." This is a low threshold, which " 'does not require conclusive proof of authenticity, but only sufficient foundational evidence for the trier of fact to conclude that * * * [the evidence] is what its proponent claims it to be.' " *State v. Young*, 2d Dist. Montgomery No. 18874, 2002 WL 471846, *2 (Mar. 29, 2002), quoting *State v. Easter*, 75 Ohio App.3d 22, 25, 598 N.E.2d 845 (4th Dist.1991).

{¶ 143} Having reviewed the search warrants and related documents in the appendix, there was no sound basis for concluding that these documents were not what they purport to be. They included time-stamped copies of documents from the Miami

County Municipal Court, and the affidavits for the search warrants were signed by either Lt. Moore or Det. Cooper and were sworn to before the Miami County Municipal Court Judge. The affidavits also referred to Wright by name or referred to his residence at the time. Furthermore, the documents all bore a dated reference on the bottom to Wright's common pleas criminal case, i.e., "02/11/2020/20CR087" together with page numbers ranging from 65 to 82 and 93. Clearly, these documents were released to Wright as discovery in his criminal case, and the numbers on the bottom corresponded with other documents contained in the "Pretrial Discovery" portion of the appendix. Accordingly, authentication was not a proper basis for the rejection of this claim.

{¶ 144} The trial court's second reason for rejection was that a "common sense" nexus existed between K.W.'s statements and the items listed in the warrants. Wright does not address this point in his brief, but simply states that there was no reasonable strategy for not filing a motion to suppress. Appellant's Brief at p. 23.

{¶ 145} "[A] petition for post-conviction relief, rather than a direct appeal, is usually the proper method for pursuing an ineffective-assistance claim involving an attorney's failure to file a suppression motion." *State v. Spriggs*, 2d Dist. Champaign No. 1998-CA-19, 1998 WL 879262, *6 (Dec. 18, 1998), citing *State v. Gibson*, 69 Ohio App.2d 91, 95, 430 N.E.2d 954 (8th Dist.1980). "In each such case, because no suppression motion was filed, the defendant will usually have to rely on evidence outside the appellate record. * * * That evidence can only be considered in a proceeding for post-conviction relief." *Id.* This was true here, as the search warrant materials were not part of the record on direct appeal.

{¶ 146} As a general rule, "[f]ailing to file a motion to suppress does not constitute

ineffective assistance of counsel per se." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, 873 N.E.2d 858, ¶ 65, citing *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). Whether the issue is before the court on direct appeal (as in *Brown* and *Madrigal*) or on the merits of a post-conviction petition, "[t]o establish ineffective assistance of counsel for failure to file a motion to suppress, a defendant must prove that there was a basis to suppress the evidence in question." *Id.*, citing *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 35. *Accord State v. Messer-Tomak*, 10th Dist. Franklin No. 10AP-847, 2011-Ohio-3700, ¶ 41 (applying *Madrigal* and *Adams* in a post-conviction case). Again, these general principles must be tempered by the fact that in order to obtain a hearing in a post-conviction action, the standard is less; a petitioner need not definitively prove counsel was defective and that the defendant was prejudiced. *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 27. However, even under this standard, there was no basis for a hearing on the claim that Wright's counsel rendered ineffective assistance in failing to file a motion to suppress.

{¶ 147} " 'The security of one's privacy against arbitrary intrusion by the police—which is at the core of the Fourth Amendment—is basic to a free society.' " *State v. Castagnola*, 145 Ohio St.3d 1, 2015-Ohio-1565, 46 N.E.3d 638, ¶ 33, quoting *Wolf v. Colorado*, 338 U.S. 25, 27, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949), *overruled on other grounds*, *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

{¶ 148} Under the Fourth Amendment to the United State Constitution, " * * * no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Similarly, Ohio Constitution, Article I, Section 14 states that " * * * no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized." Ohio courts "will generally 'harmonize our interpretation of Section 14, Article I of the Ohio Constitution with the Fourth Amendment, unless there are persuasive reasons to find otherwise.' " (Emphasis omitted.) *State v. Bembry*, 151 Ohio St.3d 502, 2017-Ohio-8114, 90 N.E.3d 891, ¶ 24, quoting *State v. Robinette*, 80 Ohio St.3d 234, 239, 685 N.E.2d 762 (1997). No such persuasive reasons have been advanced here.

{¶ 149} "For a search warrant to issue, the evidence must be sufficient for the magistrate to conclude that there is a fair probability that evidence of a crime will be found in a particular place. The reviewing court then must ensure that the magistrate had a substantial basis for concluding that probable cause existed." *Castagnola* at ¶ 35, citing *State v. George*, 45 Ohio St.3d 325, 329, 544 N.E.2d 640 (1989). In deciding "whether a search warrant was issued upon a proper showing of probable cause, reviewing courts must examine the totality of the circumstances." *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, 37 N.E.3d 123, ¶ 13, citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In *Gates*, the court stressed that " 'only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Id.* at 235, quoting *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

{¶ 150} In light of the statements that K.W. made in her initial interview with Det. Cooper, there would be no possible basis for finding that the police lacked probable cause to search Wright's home. Therefore, a suppression motion would not have been even

arguably successful in this regard.

{¶ 151} In the trial court, Wright's petition claimed there was no reason to search for K.W.'s clothing or bed sheets because K.W. told Det. Cooper that Wright removed her clothing before raping her. Reply Memorandum at p. 26. As noted, the trial court found a sufficient nexus between K.W.'s statements and the items the warrant listed. We agree. Given K.W.'s allegation that she was assaulted in her bed and that her clothing was still in a laundry basket in her room, there was a fair probability that evidence of criminal activity would be found in the places listed in the warrant. As the trial court noted, DNA (from which Wright could not be excluded) in fact was found on K.W.'s underwear. Decision at p. 9. The search was also very narrow, and the police seized a limited number of items. *See* App., Return, Receipt, Inventory on Search Warrant, 02/11/2020/20CR087, p. 72.

{¶ 152} Accordingly, on its face, Wright's petition was not sufficient to raise an issue concerning whether Wright was deprived of effective assistance when trial counsel failed to file a motion to suppress. *Bunch*, Ohio Slip Opinion No. 2022-Ohio-4723, __ N.E.3d __, at ¶ 27.

{¶ 153} Based on the preceding discussion, the first assignment of error is sustained in part and overruled in part.


III.   Denial of Petition on the Merits

{¶ 154} Wright's second assignment of error states that:

> The Trial Court Erred in Denying Wright's Petition for Post-Conviction

Relief on the Merits Without a Hearing, Thereby Depriving Him of His Right to Due Process of Law and His Right to Effective Assistance of Counsel in Violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Comparable Provisions of the Ohio Constitution.

{¶ 155} Under this assignment of error, Wright argues that if we find the trial court properly denied his claims without a hearing, we should nonetheless reverse the court's decision as if it had denied the petition on the merits. Since we have concluded that this matter must be reversed and remanded for a hearing on the issues outlined above, we need not consider this assignment at this time. We also note that the trial court's decision did not really consider most of the issues on the merits; instead, the court primarily rejected the claims because they involved matters raised on direct appeal or were cumulative of matters raised on direct appeal. As noted, this was not a proper basis for denying a hearing.

IV. Conclusion

{¶ 156} The judgment of the trial court is affirmed in part and reversed in part. This cause is remanded for a hearing on the post-conviction petition consistent with our opinion.

. . . . . . . . . . . . .

LEWIS, J. and HUFFMAN, J., concur.